MARC J. WINTHROP – State Bar No. 63218
CHARLES LIU – State Bar No. 190513
PAYAM KHODADADI – State Bar No. 239906
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Ste 400
Newport Beach, CA 92660
mwinthrop@winthropcouchot.com
cliu@winthropcouchot.com
payam@winthropcouchot.com
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

General Insolvency Counsel for
Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>MODTECH HOLDINGS, INC.<br>a Delaware Corporation,<br><br>        Debtor and<br>        Debtor-in- Possession. | Case No. 6:08-bk-24324-TD<br><br>Chapter 11 Proceeding<br><br>**DEBTOR'S MOTION FOR ORDER (1) APPROVING THE SALE OF THE DEBTOR'S ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS PURSUANT TO 11 U.S.C. § 363; (2) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS; AND (3) AUTHORIZING THE REJECTION OF THE DEBTOR'S INTERESTS, IF ANY, IN CERTAIN EXECUTORY CONTRACTS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF DENNIS SHOGREN IN SUPPORT HEREOF**<br><br>DATE:<br>TIME:<br>PLACE: |

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION .................................................................................................. 4

II.  STATEMENT OF FACTS .................................................................................. 4

    A.   Background of Debtor........................................................................... 4
    B.   Debtor's Financial Difficulties ............................................................ 5
    C.   The Purchased Assets ........................................................................... 6
    D.   The Need for Sale ................................................................................. 6
    E.   The Debtor's Marketing Efforts............................................................ 6
    F.   Disclosure About the Purchaser............................................................ 7

III. THE PROPOSED SALE OF THE ASSETS OF THE DEBTOR ........................... 8

    A.   The Terms of the Proposed Sale ........................................................... 8
        Purchase Price ...................................................................................... 8
        Purchased Assets................................................................................... 9
        Excluded Assets.................................................................................... 9
        Assumed Liabilities ............................................................................. 9
        Excluded Liabilities ............................................................................. 9
        Contracts to Be Assumed and Assigned ............................................... 10
        Closing................................................................................................. 10
        Representations and Warranties............................................................. 10
        Termination Rights ............................................................................... 10
    B.   Court Approved Overbid Procedures..................................................... 10
        Assets to Be Sold ................................................................................. 10
        Potential Bidders; Confidentiality Agreement....................................... 10
        Qualified Bidders ................................................................................. 11
        Bidding Process ................................................................................... 11
        Bid Deadline ........................................................................................ 11
        Bid Requirements.................................................................................. 12
        Good Faith Deposit .............................................................................. 12
        Minimum Overbid ................................................................................ 12
        Irrevocable ........................................................................................... 12
        The Same or Better Terms .................................................................... 12
        Contingencies....................................................................................... 13
        Financing Sources................................................................................. 13
        No Fees Payable to Qualified Bidder..................................................... 13
        Qualified Bids ...................................................................................... 13
        Auction................................................................................................. 14
        Acceptance of Successful Bid................................................................ 15
    C.   The Purchase Price Is Fair and Reasonable .......................................... 15

IV.  THE PROPOSED SALE SHOULD BE APPROVED PURSUANT
    TO 11 U.S.C. § 363(b) AND 11 U.S.C. § 363(f) ............................................... 16
    A.   The Sale Should Be Approved Under § 363(b) ..................................... 17
    B.   The Purchase Price Compares Favorably with the Value
        of the Assets of the Debtor................................................................... 18
    C.   The Motion Should be Granted Under 11 U.S.C. § 363(f)...................... 19

## TABLE OF CONTENTS

**(Continued)**

PAGE

V. THE PURCHASER IS ENTITLED TO A FINDING THAT IT IS A
GOOD FAITH PURCHASER UNDER SECTION 363(m) .................................... 19

VI. THE DEBTOR SHOULD BE AUTHORIZED TO ASSUME AND
ASSIGN CERTAIN CONTRACTS AS PART OF THE SALE OF THE
DEBTOR'S ASSETS........................................................................................ 20

VII. THE BANKRUPTCY CODE ACCORDS SIGNIFICANT
DEFERENCE TO A DEBTOR'S DECISION TO REJECT OR
ASSUME PRE-PETITION CONTRACTS ............................................................ 21

VIII. THE COURT HAS THE DISCRETION TO AND SHOULD WAIVE
THE TEN-DAY PERIOD FOR THE EFFECTIVENESS OF A
SALE ORDER ................................................................................................ 22

IX. CONCLUSION................................................................................................ 23

MAINDOCS-#129953-v3-Modtech_-_Sale_Motion.DOC

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),
    722 F.2d 1063 (2d Cir. 1983);.................................................17, 18

Community Thrift & Loan v. Suchy (In re Suchy),
    786 F.2d 900 (9th Cir.1985))..........................................................20

Ewell v. Diebert (In re Ewell),
    958 F.2d 276 (9th Cir.1992)...........................................................19

In re A.H. Robins Co.,
    68 B.R. 705 (Bankr.E.D.Va. 1986) ...............................................22

In re Abbotts Dairies of Pennsylvania, Inc.,
    788 F.2d 143 (3d Cir.1986)).........................................................19

In re Anchor Exploration Co.,
    30 B.R. 802 (Bankr. N.D. Okla. 1983)...................................17, 18

In re Bergt,
    241 B.R. 17 (Bankr.D.Alaska 1999) ............................................21

In re Delaware & Hudson Railway Co.,
    124 B.R. 169 (D. Del. 1991) .........................................................18

In re Filtercorp, Inc.,
    163 F.3d 570 (9th Cir. 1998),........................................................19

In re GP Express Airlines, Inc.,
    200 B.R. 222 (Bankr. D. Ne. 1996)..............................................20

In re Huang,
    23 B.R. 798 (9th Cir. BAP 1982) ................................................22

In re JFD Enterprises,
    215 F.3d 1312, 2000 WL 560189, *5 (1st Cir. 2000) ................22

In re Lubrizol Enterprises,
    756 F.2d 1043 (4th Cir. 1985) cert. denied, 475 U.S. 1057 (1986) ........22

In re Minges,
    602 F.2d 38 (3d Cir. 1979)...........................................................22

In re Onecast Media, Inc.,
    439 F.3d 558 (9th Cir. 2006)........................................................21

In re Oneida Lake Development, Inc., 114 B.R. 352, 355 (Bankr. N.D.N.Y. 1990)......................18

MAINDOCS-#129953-v3-Modtech_-_Sale_Motion.DOC

# TABLE OF AUTHORITIES

## (Continued)

PAGE

In re Orion Pictures Corp.,
4 F.3d 1095 (2nd Cir. 1993), cert. denied, 114 S.Ct. 1418 (1994) ...........................22

In re Penn Traffic Co.,
2005 WL 2276879, *4 (S.D.N.Y. 2005) ...................................................................21

In re WPRV-TV,
983 F.2d 336 (1st Cir. 1993), .....................................................................................17

New Haven Radio, Inc. v. Meister (In re Martin-Trigona),
760 F.2d 1334 (2d Cir. 1985) .....................................................................................17

NLRB v. Bildisco & Bildisco,
465 U.S. 513 (1984) ....................................................................................................21

Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.),
950 F.2d 1492 (9th Cir. 1991); ...................................................................................17

Phar-Mor, Inc. v. Strouss Building Associates,
204 B.R. 948 (N.D. Ohio 1997) .................................................................................20

Stephens Indus., Inc. v. McClung,
789 F.2d 386 (6th Cir. 1986) ......................................................................................17

**STATUTES**

11 U.S.C. § 363...................................................................................................................2
11 U.S.C. § 363(b)...........................................................................................16, 17, 20
11 U.S.C. § 363(f)..............................................................................................3, 16, 19
11 U.S.C. § 363(k)........................................................................................................13
11 U.S.C. § 363(m)...........................................................................................3, 19, 20
11 U.S.C. § 365..........................................................................................................3, 21
11 U.S.C. § 365(a).........................................................................................................20
11 U.S.C. § 365(b).........................................................................................................20
11 U.S.C. §§ 365(b)(1)(C)..........................................................................................21
11 U.S.C. § 503..............................................................................................................13

**RULES**

Fed.R.Bankr.P. 6004(g) ...........................................................................................3, 22
Fed.R.Bankr.P. 6006(d) .................................................................................................3

**TO THE HONORABLE THOMAS DONOVAN, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, CREDITORS AND PARTIES IN INTEREST:**

Modtech Holdings, Inc., a Delaware corporation, the debtor and debtor-in-possession in the above entitled Chapter 11 proceeding (the "Debtor"), will and does hereby move for an Order (1) Approving the Sale of the Debtor's Assets of the Estate Free and Clear of Liens, Claims, and Interests Pursuant to 11 U.S.C. § 363 (the "Assets"); (2) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (3) Authorizing the Rejection of the Debtor's Interests, if any, in Certain Executory Contracts (the "Motion").

This Motion is based upon the Memorandum of Points and Authorities set forth herein below, the Declaration of Declaration of Dennis Shogren (the "Shogren Declaration") attached hereto, all pleadings, papers and records on file with the Court, and such other evidence, oral or documentary, as may be presented to the Court at the time of the hearing on the within Motion.

**WHEREFORE,** the Debtor prays that this Court enter an Order:

1.      Authorizing the sale of substantially all assets of the estate (the "Assets") to Laurus Master Fund, Ltd., a Cayman Islands company (In Liquidation) ("LMF"), Valens Offshore SPV I, Ltd., a Cayman Islands company ("VOFSPVI") and Valens U.S. SPV I, LLC, a Delaware limited liability company ("Valens US" and together with LMF, VOFSPVI, Valens US, and with their respective successors, assigns, and designees, collectively, the "Purchaser" or "Laurus"), pursuant to the Asset Purchase Agreement between the Debtor and the Purchaser (the "Agreement"), a true and correct copy of which is attached as Exhibit "1" to the Declaration of Dennis Shogren"), or the highest bidder for the Assets ("Successful Bidder"), for a total consideration of not less than Five million dollars ($5,000,000) (the "Purchase Price");

2.      Authorizing, with appropriate findings, the sale of the Assets to the Bidder or Successful Bidder, free and clear of all claims, liens, charges, security interests, encumbrances or liabilities, including successor liabilities pursuant to Section 363 of the Bankruptcy Code or any adverse claims (hereinafter collectively referred to as "Liens and Encumbrances"), if any, pursuant

to 11 U.S.C. § 363(f), with the Liens and Encumbrances to attach to the net sales proceeds in the preexisting order of priority;

3.     Fixing the amounts necessary to cure any and all defaults of all executory contracts and unexpired leases assumed by the Debtor and assigned to the Bidder or Successful Bidder;

4.     Authorizing, with appropriate findings, the Debtor to assume and assign to the Bidder or Successful Bidder those unexpired leases and executory contracts set forth on Schedule 2.1 of the Agreement pursuant to Section 365 of the Bankruptcy Code;

5.     With appropriate findings of the Court regarding the adequacy of notice to creditors and parties in interest relating to the within Motion;

6.     With appropriate findings of the Court establishing: (i) the good faith of the Debtor and the Bidder or Successful Bidder in connection with the negotiation, execution, delivery, and consummation of the sale of the Assets; and (ii) the arms-length nature of such negotiations and transactions, together with such other findings as are necessary to ensure that the Debtor and the Bidder or Successful Bidder are each entitled to the protection afforded by 11 U.S.C. § 363(m) with respect to all transactions approved in such Court order;

7.     Waiving the ten (10) day stay of order provided in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure; and

8.     Granting such other and further relief as the Court deems just and appropriate.


DATED: May 15, 2009                    **WINTHROP COUCHOT**
                                       **PROFESSIONAL CORPORATION**

                                       By:   /s/ Marc J. Winthrop
                                             Marc J. Winthrop
                                             Charles Liu
                                             Payam Khodadadi
                                       General Insolvency Counsel for Debtor and
                                       Debtor-in-Possession

MAINDOCS-#129953-v3-Modtech_-_Sale_Motion.DOC

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

In order to maximize the value of its business and assets for the benefit of creditors, Modtech Holdings, Inc., the debtor and debtor-in-possession herein (the "Debtor" or "Modtech"), hereby seeks to sell substantially all assets of the estate (the "Assets") to Laurus Master Fund, Ltd., a Cayman Islands company (In Liquidation) ("LMF"), Valens Offshore SPV I, Ltd., a Cayman Islands company ("VOFSPVI") and Valens U.S. SPV I, LLC, a Delaware limited liability company ("Valens US" and together with LMF, VOFSPVI, Valens US, and with their respective successors, assigns, and designees, collectively, the "Purchaser" or "Laurus"), pursuant to the Asset Purchase Agreement between the Debtor and the Purchaser (the "Agreement"), a true and correct copy of which is attached as Exhibit "1" to the Declaration of Dennis Shogren"), or the highest bidder for the Assets ("Successful Bidder"), for a total consideration of not less than five million dollars ($5,000,000) (the "Purchase Price").

## II.

## STATEMENT OF FACTS

### A.    Background of Debtor

The Debtor was founded in 1982 with its initial business consisting of purchasing unfinished and outdated classroom shells and performing installation work. The Debtor subsequently changed its business to the design, manufacturing, marketing and installation of classroom and other custom modular projects. In February 1999, the Debtor merged with SPI Holdings Inc., a Colorado corporation, which designed and manufactured commercial and light industrial modular buildings in Arizona, Texas and California. In March 1999, the Debtor acquired Coastal Modular Buildings, Inc., and in March 2001 the Debtor acquired Innovative Modular Structures. Both companies were based in central Florida. All of the acquired companies have been fully integrated into the Debtor.

The Debtor was a leading provider of modular classrooms in California and Florida and was a significant provider of commercial and light industrial modular buildings in California,

MAINDOCS-#129953-v3-Modtech_-_Sale_Motion.DOC

1 Florida, Arizona, Nevada and other neighboring states. The Debtor also produced other modular

2 building products such as single family and multi-unit residences, military training buildings, and

3 concrete block restroom facilities.

4 In California, the Debtor markets and sells modular classrooms primarily to school

5 districts. Sales of classrooms to individual California school districts accounted for approximately

6 49.9% of net sales during the year ended December 31, 2007. The Debtor also designs and builds

7 modular buildings to customer specifications for a wide array of uses beyond California

8 classrooms, including residential, governmental, healthcare, educational, airport and correctional

9 facilities; office and retail space; daycare centers; libraries; churches; construction trailers; golf

10 clubhouses; police stations; convenience stores; fast food restaurants; classrooms and sales offices.

11 The Debtor also sells classrooms to the State of California and leasing companies, both of which

12 lease the classrooms principally to school districts. The Debtor markets modular classrooms

13 directly and its other products are sold through a network of independent dealers.

14 A substantial portion of the Debtor's sales require bid, performance and payment bonds to

15 ensure that the contracts will be performed and completed in accordance with contract terms and

16 conditions, and to assure that subcontractors and suppliers will be paid. From time to time the

17 Debtor has had difficulty in obtaining bonding for certain large projects.

18 **B.** **Debtor's Financial Difficulties**

19 The Debtor's financial problems and the consequent need to file this bankruptcy

20 proceeding was primarily caused by the following problems:

21 The decrease in sales in 2008 in California was primarily due to a continuing general

22 slowdown in the education and commercial markets and general economic conditions. California

23 public school enrollment has been essentially flat over the last three years and, while funds from

24 recently enacted bond measures are available, spending for new schools has slowed from prior

25 years. This leveling off of school enrollment has led to decreased demand for new school

26 construction, causing a higher percentage of school bond funds to be utilized for modernization of

27 existing structures and less on new permanent construction or facilities. Even the fast growing

28 school districts are proceeding more conservatively in light of the slowdown in other districts.

The modernization work did not benefit the Debtor due to the availability of temporary classrooms from existing stock of leasing companies. It appears that the State of California's current budget deficit and current proposed budget cuts have caused delays in school construction projects, in spite of voter-approved bond measures for classroom and school construction. The decrease in the commercial market can be attributed to the slowdown in the construction and housing markets.

The sales decrease in Florida in 2008 was due to slowness in the education market as a result of declining school enrollment. The sales decrease in Arizona in 2008 was due to the decreased volume of orders in the education markets for Arizona and Nevada.

### C.    The Purchased Assets.

As used in this Motion and in the Agreement, "Purchased Assets" means and refers to all assets, properties, interests and rights of the Debtor, other than the Excluded Assets, as of the Closing, used or useful in connection with or related to the Business, all as more particularly set forth in Section 2.1 of the Agreement. The Excluded Assets are more particularly set forth in Section 2.2 of the Agreement, all of which shall remain the exclusive property of the Debtor, free and clear of any secured claim of the Purchaser.

### D.    The Need for Sale.

The Debtor believes that selling its assets as a going concern will bring the most value for the Debtor's assets.

### E.    The Debtor's Marketing Efforts.

The Debtor has spent a significant amount of time marketing its property and business as a going concern both prior to filing for Chapter 11 protection and following the filing for Chapter 11 protection. The Debtor has been unsuccessful in its attempts to find a suitable purchaser.

Prior to filing for Chapter 11 protection, the Debtor held meetings with, among others, Cavco Industries, Inc. ("Cavco"), one of the largest producers of manufactured homes in the United States and Palm Harbor Homes, Inc. ("Palm Harbor"), one of the largest marketers of factory built homes in the United States. Both Cavco and Palm Harbor expressed interest in doing business with, or taking over, the Debtor. To that end, the Debtor pursued negotiations with

Cavco and Palm Harbor based on its determination that such companies could offer the Debtor with the best return for its business. In both circumstances, the Debtor explored the possibility of a joint venture and the out right sale of its business as a going concern. However, due to the economic downturn in 2008, neither the negotiations with Cavco nor Palm Harbor came to fruition.

Following the filing for Chapter 11 protection, the Debtor met with various companies, including Sustainable Structures, Silver Creek Industries, Inc. ("Silver Creek"), Southern Modular Industries LP ("Southern Modular") and Global Modular Inc. ("Global Modular"). The Debtor, however, was unsuccessful to come to an agreement with any of these companies. With respect to Sustainable Structures, the offer made was too low. Silvercreek and Southern Modular, both of which had held meetings with Laurus (defined below), the Debtor's pre-petition and post-petition creditor, were only interested in purchasing some of the Debtor's assets, and were not interested in buying the Debtor as a going concern. The Debtor decided not to go forward with the offered sale with such entities based on its determination that such a sale would not provide the Debtor with the highest and best value for its business. Finally, Global Modular, which has purchased a majority of the Debtor's tangible equipment and inventory in California and Florida, has shown interest in a licensing agreement to use a portion of the Debtor's facilities on a project-by-project basis but is not interested in purchasing the Debtor as a going concern or purchasing all of the Debtor's assets.

The Debtor did not hire a broker to market its assets. This is because the Debtor believed the most likely buyer of the Debtor's assets would be another "player" in the industry and the Debtor's management had relationships with the industry "players." Therefore, the Debtor was able to directly approach seven other companies in the industry and entered into discussions with six of them without the need to pay any broker. Furthermore, there were three investment bankers on the Debtor's board of directors who put out "feelers" for potential investors.

F.    **Disclosure About the Purchaser**.

The Purchaser is the Debtor's principal pre-petition secured creditor who holds a security interest in substantially all of the Debtor's assets. As of the Petition Date, the approximate sum of

1  $14,402,008 was due to the Purchaser.  Following the Sale, the Debtor's CEO, Dennis Shogren,

2  may work for the Purchaser in a significant management capacity, but there is no agreement or

3  proposed agreement in this regard.

**III.**

**<u>THE PROPOSED SALE OF THE ASSETS OF THE DEBTOR</u>**

6        The Purchaser has offered to purchase the Assets, subject to overbid, for the Purchase

7  Price.  The Debtor firmly believes that the greatest value that can be realized from the sale of its

8  assets if it is sold as a going concern.  If the Debtor's business were shut down and efforts were

9  made by a trustee to sell the Debtor's assets, the Debtor firmly believes that the value realized

10  would be minimal, if anything, as a significant value driver (the Debtor's key employees,

11  relationships, etc.) would have been destroyed.  All of the terms of the Sale are set forth in the

12  Agreement.  A true and correct copy of the Agreement is attached to the Shogren Declaration as

13  Exhibit "1."

14      **A.**    **<u>The Terms of the Proposed Sale.</u>**

15        All capitalized terms used herein and not defined have the meanings provided in the

16  Agreement.  The description below only summarizes certain provisions of the Agreement, and the

17  terms of the Agreement control in the event of any inconsistency:

18        <u>Purchase Price</u>.  The Agreement provides that the Debtor acknowledges, confirms and

19  agrees that as of the close of business on May 14, 2009, (a) the Debtor is indebted to the Purchaser

20  with respect to loans and advances under the Pre-petition Facility in the aggregate principal

21  amount set forth in Schedule 3.1 of the Agreement (the "Principal Amount") together with interest

22  accrued on the Principal Amount, and fees, costs, expenses and other charges payable by the

23  Debtor to Purchaser, including legal and consultant fees and expenses through the Closing

24  (collectively with the Principal Amount, the "Lenders Debt"); (b) the entities comprising

25  Purchaser have and shall continue to have valid, enforceable and perfected first-priority liens upon

26  and security interests in the Purchased Assets granted to Purchaser in connection with the Pre-

27  petition Facility, except for Lenders' unperfected lien on the real property lease for the property

28  located at 2830 Barrett Avenue, Perris, CA,  and (c) the Lenders Debt is a valid and unconditional

-8-

obligation of the Debtor to the Purchaser and is due and owing without offset, defense or counterclaim of any kind, nature or description whatsoever and the Debtor hereby expressly waives any and all rights to contest and/or challenge in any manner whatsoever the Purchaser's perfected first-priority liens upon and security interests in the Purchased Assets. Subject to Purchaser's right (but not obligation) to overbid at the Auction in accordance with the Sales Procedures Order, the Purchase Price for the Purchased Assets shall be the Credit Bid Amount of $5 million, plus Purchaser's assumption of the Assumed Liabilities. However, Debtor and Lenders may agree to accept a purchase price lower than the Credit Bid Amount.

Purchased Assets. At the Closing, Purchaser shall purchase, acquire and accept from the Debtor, and the Debtor shall sell, transfer, assign, convey and deliver, free and clear of all liens, claims, encumbrances and Interests, to Purchaser all of the Debtor's right, title and interest in, to and under the Purchased Assets. As used in the Agreement, "Purchased Assets" means and refers to all assets, properties, interests and rights of the Debtor's, other than the Excluded Assets, as of the Closing, used or useful in connection with or related to the Business, all as more particularly set forth in Section 2.1 of the Agreement.

Excluded Assets. The "Purchased Assets" described in Section 2.1 of the Agreement do not include the "Excluded Assets," which "Excluded Assets" are more particularly set forth in Section 2.2 of the Agreement, all of which shall remain the exclusive property of Debtor, free and clear of any secured claim of the Purchaser.

Assumed Liabilities. At the Closing, the Purchaser will assume those (and only those) Liabilities of the Debtor specifically described in section 2.3 of the Agreement (collectively, the "Assumed Liabilities").

Excluded Liabilities. The Purchaser is not assuming, and shall not be deemed to have assumed, any Liabilities of the Debtor other than the Assumed Liabilities (all such Liabilities of Debtor other than the Assumed Liabilities, including, without limitation, those other Liabilities described in Section 2.4 of the Agreement are collectively referred to as the "Excluded Liabilities").

Contracts to be Assumed and Assigned. The Section 2.1 of the Agreement provides for the Debtor to assume and assign all of Debtor's right, title and interest in and to the Assumed Leases and Assumed Contracts to the Purchaser as part of the Purchaser's acquisition of the Purchased Assets. The Assumed Leases and Assumed Contracts, as finally determined in accordance with the Agreement with the Purchaser or other successful bidder, are referred to herein as the "Assumed Executory Contracts."

Closing. The closing of the transactions under the Agreement (the "Closing") shall take place on the business day selected by the Purchaser on or following which all of the conditions set forth in Article 10 of the Agreement have been satisfied or waived in accordance with the Agreement; provided that Purchaser has the right to terminate the Agreement in the event that the Closing has not occurred by ninety (90) days following execution of the Agreement or if the Sale Order is not entered by the Bankruptcy Court on or before the date which is sixty (60) days following execution of the. The Closing shall be held at the place provided in the Agreement.

Representations and Warranties. Articles V and VI of the Agreement contain representations and warranties of the parties.

Termination Rights. Section 4.4 of the Agreement provides various grounds upon which the Agreement may be terminated by the Debtor and/or Purchaser.

**B.    Court Approved Overbid Procedures.**

The Bid Procedures are attached to the Shogren Declaration as Exhibit "2". The Bid Procedures are summarized as follows:

Assets to be Sold. The Debtor proposes to sell substantially all of its assets as a going concern.

Potential Bidders; Confidentiality Agreement. Any person interested in participating in the bidding process for all or a portion of the Purchased Assets (each a "Potential Bidder") must deliver (unless previously delivered) to the Debtor and its counsel an executed confidentiality agreement in form and substance acceptable to the Debtor and its counsel, and satisfy the other requirements set forth in the Bid Procedures.

MAINDOCS-#129953-v3-Modtech_-_Sale_Motion.DOC

Qualified Bidders. A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the assets of the Debtor do not overlap and who also is referred to in the Bid Procedures as a single Qualified Bidder) that delivers the confidentiality agreement and the documents described the Bid Procedures with respect to its proof of financial ability to perform, and that the Debtor, in its discretion and with assistance from their advisors, in consultation with the Purchaser and any official committee of unsecured creditors in this case (the "Committee"), determine is reasonably likely to submit a bona fide offer that would result in greater value being received for the benefit of the Debtor's creditors than under the Agreement and to be able to consummate a sale if selected as a Successful Bidder (defined below); however, the Debtor and Lenders can mutually agree to allow an entity to be a Qualified Bidder that submits a bid lower than the Credit Bid Amount. The Purchaser (together with any assigns) is a Qualified Bidder and is deemed to satisfy all Bid Requirements (hereinafter defined).

Bidding Process. The Debtor and its advisors, shall: (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of bidders in conducting their due diligence investigations, as permitted by the provisions of the Bidding Procedures; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Purchased Assets (collectively, the "Bidding Process"). The Debtor shall have the right to adopt such other rules for the Bidding Process (including rules that may depart from those set forth herein) that will better promote the goals of the Bidding Process and that are not inconsistent with any of the other provisions hereof or of any Bankruptcy Court order.

Bid Deadline. The Debtor will request the Court set a a deadline for submitting bids by a Qualified Bidder (the "Bid Deadline"). Prior to the Bid Deadline, a Qualified Bidder that desires to make an offer, solicitation or proposal (a "Bid") shall deliver written copies of its Bid to (i) the Debtor, 2830 Barrett Ave., Perris, CA 92571, Attn. Dennis Shogren, CEO, with a copy to counsel for the Debtor, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Fourth Floor, Newport Beach, California 92660, PJ Marksbury; (ii) the Purchaser, c/o Laurus Capital Management, LLC, 335 Madison Avenue, 10th Floor, New York, New York 10017, Attn: Ms. Wen Hsu, with a copy to Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 11th

MAINDOCS-#129953-v3-Modtech_-_Sale_Motion.DOC

Floor, Los Angeles, California 90067, Attn: Ira Kharasch; and (iii) counsel for the Committee, Marshack Hays, LLP, 5410 Trabuco Road, Irvine, California, 92620, Attn: Richard A. Marshack (collectively, the "Notice Parties"), by the Bid Deadline, provided, however, that any confidential financial information may be delivered to the Debtor and its counsel only. A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

Bid Requirements. The Debtor proposes that, to be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid must be determined by the Debtor, in consultation with the Purchaser and the Committee, to satisfy each of the following conditions:

Good Faith Deposit. Each Bid, other than a Bid submitted by the Purchaser, must be accompanied by a deposit (the "Good Faith Deposit") in the form of a certified check or cash payable to the order of the Debtor in an amount equal to five percent (5%) of the Purchase Price under the Bid.

Minimum Overbid. The consideration proposed by the Bid may include only cash and/or other consideration acceptable to the Debtor. The aggregate consideration must equal or exceed the sum of the Purchase Price (including without limitation the assumption of Assumed Liabilities, the payment of the Cure Amounts) plus $50,000; however, the Debtor and Lenders can agree to allow overbids in an amount less than the Credit Bid Amount.

Irrevocable. A Bid must be irrevocable until the earlier of (a) closing of the transaction with the Successful Bidder, or (b) ten (10) days after the Sale Order has become final and non-appealable (the "Termination Date").

The Same or Better Terms. The Bid must be on terms that, in the Debtor's business judgment, are substantially the same or better than the terms of the Agreement. A Bid must include an executed agreement pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "Contemplated Transaction Documents"). A Bid shall include a copy of the Agreement marked to show all changes requested by the Bidder (including those related to the Purchase Price). The Contemplated Transaction Documents must include a commitment to close by the date on which the Sale Order becomes final and non-appealable. A Bid should propose a contemplated transaction involving all or substantially of the Purchased

-12-

Assets, provided, however, that the Debtor in its discretion may consider proposals for less than substantially all the Purchased Assets, provided further that the Debtor will evaluate all Bids, in its sole discretion, to determine whether such Bid or combination of Bids maximizes the value of the Debtor's estates as a whole. The Debtor is not entitled under the Agreement to accept a Bid for less than amount of the Purchaser's prepetition and postpetition debt unless the Purchaser agrees.

Contingencies. A Bid may not be conditioned on obtaining financing or any internal approval or otherwise be subject to contingencies more burdensome than those in the Agreement, unless the Debtor in its discretion, in consultation with the Purchaser and the Committee, otherwise agree, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties at or before closing or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Agreement.

Financing Sources. A Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtor with appropriate contact information for such financing sources.

No Fees Payable to Qualified Bidder. A Bid may not request or entitle the Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment. Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code § 503 related in any way to the submission of its Bid or the Bidding Procedures.

Qualified Bids. The Debtor proposes that a Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements and that satisfies the Bid Deadline requirement above shall constitute a "Qualified Bid," if the Debtor believes, in its reasonable discretion, that such Bid would be consummated if selected as the Successful Bid. The Debtor shall have the right to reject any and all bids that it believes, in its reasonable discretion and in consultation with the Committee, do not comply with the Bidding Procedures. For purposes hereof, the Agreement shall constitute a Qualified Bid, and the Purchase Price under the Agreement shall constitute a credit bid by the Purchaser under Bankruptcy Code § 363(k).

Auction. The Debtor will conduct an auction (the "Auction") to determine the highest and best bid with respect to the Purchased Assets.

The Debtor shall provide the Purchaser and all Qualified Bidders with copies of all Qualified Bids by the business day following the Bid Deadline, which may exclude any confidential financial information, as determined by the Debtor in its reasonable discretion or which has been so designated by the Qualified Bidder. The Debtor will request the Court set an Auction to take place at at the offices of Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Fourth Floor, Newport Beach, California 92660.

Prior to the Auction, the Debtor will notify all Qualified Bidders of (i) the highest and best Qualified Bid, as determined by the Debtor in the Debtor's discretion (the "Baseline Bid") and (ii) the time and place of the Auction, and provide copies of all submitted bids to all Qualified Bidders.

The Debtor proposes that, if no higher and better offer is obtained at the Auction, then the Purchaser will be deemed the Successful Bidder, the Agreement will be the Successful Bid, and, at the hearing for the sale of assets (the "Sale Hearing"), the Debtor will seek approval of and authority to consummate the proposed Sale contemplated by the Agreement.

Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. Only the authorized representative of each of the Qualified Bidders, the Debtor, and any official committee appointed in this case shall be permitted to attend.

During the Auction, bidding shall begin initially with the highest Baseline Bid and subsequently continue in minimum increments of at least $25,000. Additional consideration in excess of the amount set forth in the Baseline Bid may include only cash and/or other consideration acceptable to the Debtor, except that Purchaser may submit higher bids pursuant to a credit bid. Except as otherwise set forth herein, the Debtor may conduct the Auction in the manner they determine will result in the highest and best offer for the Purchased Assets.

Additional provisions regarding the conduct of the Auction are set forth in the Bid Procedures.

MAINDOCS-#129953-v3-Modtech_-_Sale_Motion.DOC

Upon conclusion of the bidding, the Auction shall be closed, and the Debtor shall immediately identify the highest and best offer for the Purchased Assets (which may be an aggregate of bids for less than all of the Purchased Assets) (the "Successful Bid") and the entity(ies) submitting such Successful Bid (the "Successful Bidder"), which highest and best offer will provide the greatest amount of net value to the Debtor, and the next highest or otherwise best offer after the Successful Bid (the "Back-up Bid") and the entity submitting the Back-up Bid, and advise the Qualified Bidders of such determination. If the Purchaser's final bid is deemed to be highest and best at the conclusion of the Auction, the Purchaser will be the Successful Bidder, and such bid, the Successful Bid.

Acceptance of Successful Bid. The Debtor shall sell the Purchased Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing. The Debtor's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtor's acceptance of such Qualified Bid. The Debtor will be deemed to have accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing. The right of each interested party to object to the Debtor's selection of the Successful Bidder is reserved, including the right of a counterparty to any Assumed Executory Contract to object to the assignment of such Assumed Executory Contract to which it is a counterparty, and the Debtor reserves the right to contest any such objection including on the ground that the objector lacks standing, provided, however, that any objection to such assignment on the basis of amounts necessary, pursuant to Section 365 of the Bankruptcy Code, to cure all defaults to which such objector is a counterparty must be made and/or reserved in accordance with the procedures set forth in the order approving this Motion and the Bid Procedures.

**C.      The Purchase Price Is Fair And Reasonable.**

For the following reasons, the Debtor believes that the purchase price is fair and reasonable under the circumstances:

1.      The Debtor believes that the proposed sale will yield substantially more than a liquidation sale. If the Debtor cannot consummate the Sale, the Debtor is unlikely

to have the resources to sustain its operations and could therefore be forced to sell the Assets at liquidation value. Consequently, the proposed sale will maximize value for the estate's creditors.

2. The modular construction industry is a small industry and the Debtor is familiar with most of the players in this industry. Since its decision to pursue the Sale, the Debtor's personnel have worked actively in identifying and contacting potential buyers from the Debtor's contacts in the industry. The Agreement provides the best offer received by the Debtor for the Assets. All of the parties who have previously expressed interest in the Assets and other industry players the Debtor believes would be interested in bidding will receive notice of the Sale motion. The Debtor will continue to market the Assets to any and all potential buyers that express an interest in purchasing the Assets.

3. The overbid procedures approved by the Court provide further assurance that a fair price is being received for the Assets;

4. Finally, the Debtor's management believes that a sale of the Assets, as contemplated by Bidder's offer, represents a value that is consistent with the fair market value of these assets on a going concern basis. Also, although Lenders do not have a perfected lien in the real property lease in which the Debtor conducts its business, the Debtor believes the lease is a market lease, and thus there is no equity in such lease.

On the basis of the foregoing considerations, the Debtor believes that the proposed sale price is fair and reasonable, and represents the highest price obtained for the Assets.

## IV.

## THE PROPOSED SALE SHOULD BE APPROVED

## PURSUANT TO 11 U.S.C. § 363(b) AND 11 U.S.C. § 363(f)

The Debtor desires to sell substantially all of the assets of the estate to Bidder or a Successful Bidder for an amount not less than $5,000,000. A review of the applicable cases interpreting Section 363(b), and 363(f) of the Bankruptcy Code, in the light of the aforementioned facts, indicates that a sound, and in fact compelling basis exists for court approval of this sale.

MAINDOCS-#129953-v3-Modtech_-_Sale_Motion.DOC

### A.    The Sale Should Be Approved Under § 363(b).

Section 363(b) of the Bankruptcy Code empowers a debtor in possession to "sell . . . other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  The authority to sell assets conferred upon a debtor by Section 363(b) "include[s] a sale of substantially all the assets of an estate."  Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.), 950 F.2d 1492, 1495 (9th Cir. 1991); See also, In re Anchor Exploration Co., 30 B.R. 802, 808 (Bankr. N.D. Okla. 1983) (court should have wide latitude to approve sale under Section 363(b)).

A bankruptcy court's power to authorize a sale under Section 363(b) is to be exercised at the court's discretion.  In re WPRV-TV, 983 F.2d 336, 340 (1st Cir. 1993), New Haven Radio, Inc. v. Meister (In re Martin-Trigona), 760 F.2d 1334, 1346 (2d Cir. 1985), Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1069 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390-91 (6th Cir. 1986).

In Lionel, the Second Circuit Court of Appeals ("Second Circuit") held that the touchstone for the proper exercise of the debtor's discretion is a good business reason. Id. at 1071.  The Lionel court noted that the discretionary power was available to further the interests of the debtor, their creditors and their equity security holders.  Id.  The Second Circuit in Lionel adopted, in part, the following criteria for evaluating whether a good business reason exists for authorizing a sale of substantially all of the assets of a debtor:

> (1)    the proportionate value of the asset to the estate as a whole;
> (2)    the amount of elapsed time since the filing of the petition;
> (3)    the likelihood that a plan will be proposed and confirmed in the near future;
> (4)    The effect of the proposed disposition on future plans of reorganization;
> (5)    How the sale price compares with the appraised value of the asset to be sold; and
> (6)    Most importantly, whether the assets to be sold are decreasing or increasing in value.

Id. (emphasis added).

Another Court noted, however, that:

> Factors such as:  1) the proportionate value of the asset to the estate as a whole; 2) the effect of the proposed disposition on future plans of reorganization; 3) which of the alternatives of use, sale or lease, the proposal envisions; and 4) the likelihood that a plan of reorganization will be proposed and confirmed in the

MAINDOCS-#129953-v3-Modtech_-_Sale_Motion.DOC

near future are not significant where it is apparent that the proposed sale will have the effect of a total termination of the debtor's assets.

In re Oneida Lake Development, Inc., 114 B.R. 352, 355 (Bankr. N.D.N.Y. 1990).

The Debtor submits that a review of the proposed sale in the context of the criteria outlined by the Second Circuit in Lionel, as further developed by subsequent case law, demonstrates that the proposed sale should be approved.

## B. The Purchase Price Compares Favorably With the Value of the Assets of the Debtor.

As discussed herein, the Debtor believes that the Purchase Price exceeds the liquidation value of the Assets and is reasonable under the circumstances. If the Debtor cannot consummate the Sale, the Debtor is unlikely to have the resources to sustain its operations and could therefore be forced to sell the Assets at liquidation value. The proposed sale provides the timely consummation of a deal and thus realization of value for the benefit of creditors, thereby reducing the risk of a depletion in value and reducing the administrative obligations that would otherwise be incurred by the Debtor, and thus resulting in a greater recovery to creditors. The best option that the Debtor has is to sell its Assets pursuant to the Agreement.

In other cases where authority to sell assets has been sought, efforts, such as those of the Debtor, to ensure that the sale price is fair have encouraged the courts to authorize the sale. In re Delaware & Hudson Railway Co., 124 B.R. 169, 179 (D. Del. 1991) (fair and reasonable price for the sale of assets is evidenced by extensive solicitation of bids, negotiations with prospective bidders, and testimony that proposed offer is best available); In re Oneida Lake Development, Inc., 114 B.R. 352, 356 (Bankr. N.D.N.Y. 1990) (assets sold at best offer received through solicitation efforts); see also, In re Anchor Exploration Co., 30 B.R. 802, 808-09 (Bankr. N.D. Okla. 1983) (the court reversed a lower court decision authorizing a sale partly because the trustee had not attempted to solicit other offers).

On the basis of the foregoing considerations, the Debtor believes that the proposed sale price is fair and reasonable, and more important, the highest price obtainable under the circumstances.

## C.    The Motion Should Be Granted Under 11 U.S.C. 363(f).

Section 363(f) of the Bankruptcy Code describes the circumstances under which a

debtor-in-possession may sell property of the estate free and clear of any interest of third parties

in such property.  Section 363(f) provides:

> The trustee may sell property under subsection (b) or (c) of this section free and
> clear of any interest in such property of an entity other than the estate, only if --

11 U.S.C. § 363(f).

In this case, the secured creditors consent to the proposed sale.  Accordingly, the proposed

sale of the Assets free and clear of liens satisfies the criteria established by Section 363(f) of the

Bankruptcy Code.

## V.

## THE PURCHASER IS ENTITLED TO A FINDING THAT IT
## IS A GOOD FAITH PURCHASER UNDER SECTION 363(m)

Bankruptcy Code Section 363(m) provides:

> "The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does
> not affect the validity of a sale or lease under such authorization to any
> entity that purchased or leased such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale or lease were stayed pending appeal."

11 U.S.C. § 363(m).

A good faith purchaser under Section 363(m) is one who purchases for "value" and there

is no fraud or collusion in the bidding process.  In In re Filtercorp, Inc., 163 F.3d 570 (9th Cir.

1998), the Ninth Circuit held that an insider-purchaser was a good faith purchaser under

Section 363(m):

> [T]he bankruptcy court found that Gateway Lenders was a purchaser in
> good faith for all purposes including 11 U.S.C. § 363(m). This finding is
> not clearly erroneous.  **A good faith buyer "is one who buys 'in good
> faith' and 'for value.'** "Ewell v. Diebert (In re Ewell), 958 F.2d 276,
> 281 (9th Cir.1992) (citing In re Abbotts Dairies of Pennsylvania, Inc.,
> 788 F.2d 143, 147 (3d Cir.1986)). "[L]ack of good faith is [typically]
> shown by 'fraud, collusion between the purchaser and other bidders
> or the trustee, or an attempt to take grossly unfair advantage of

-19-

**other bidders.'** " Id. (quoting Community Thrift & Loan v. Suchy (In re Suchy), 786 F.2d 900, 902 (9th Cir.1985)).

Id. at 577.

In this case, as stated in the Shogren Declaration, the Purchased Assets are being marketed to all parties that the Debtor believes could be interested in buying the Purchased Assets. The proposed offer by the Purchaser is the only offer received. There is no evidence of "self-dealing" or manipulation with respect to the sale of the Purchased Assets, as the sale is being noticed to all creditors and realistic potential acquirors of the Purchased Assets. Rather, the purchase offer was negotiated, with the assistance of counsel, with a purchaser that is also represented by counsel, in an arms-length transaction, and therefore constitutes a good faith purchase in accordance with 11 U.S.C. §363(m). In view of the sound business reasons for the sale and the sale's satisfaction of the procedural and substantive requirements of Bankruptcy Code Section 363(b), the Debtor submits that approval should be granted.

## VI.

## THE DEBTOR SHOULD BE AUTHORIZED TO

## ASSUME AND ASSIGN CERTAIN CONTRACTS AS PART

## OF THE SALE OF THE DEBTOR'S ASSETS

Subject to exceptions not relevant here, Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). A bankruptcy court may authorize a debtor to assume any executory contract or unexpired lease of the debtor if doing so is within the sound business judgment of the debtor. See, Phar-Mor, Inc. v. Strouss Building Associates, 204 B.R. 948, 951-52 (N.D. Ohio 1997); In re GP Express Airlines, Inc., 200 B.R. 222, 230 (Bankr. D. Ne. 1996).

Section 365(b) of the Bankruptcy Code provides that, in order for a debtor to assume an executory contract under which there has been a default not resulting from insolvency, the debtor must cure or provide adequate assurance of the prompt cure of the default, provide compensation for pecuniary losses suffered as a result of the default and provide adequate assurance of future performance. 11 U.S.C. § 365(b). As a part of the proposed sale, the Debtor proposes to assume

MAINDOCS-#129953-v3-Modtech_-_Sale_Motion.DOC

1 | and assign to Purchaser or the Successful Bidder the contracts set forth on Schedule 2.1 to the

2 | Agreement. Purchaser proposes to promptly cure all defaults based unless Purchaser and the

3 | contracting counterparty cannot agree on a cure amounts. In that case, the Debtor instead will

4 | reject its interest in such contract.

5 | In order to assign an executory contract or unexpired lease, a debtor is required to provide

6 | adequate assurance of future performance thereunder by the assignee. 11 U.S.C. §§ 365(b)(1)(C),

7 | (f). In this instance, adequate assurance of future performance by the Purchaser under the

8 | contracts to be assumed and assigned is provided by the financial strength and experience of the

9 | Purchaser. In this case, Purchaser has tremendous resources and is well capitalized and

10 | structured.

11 |

## VII.

## THE BANKRUPTCY CODE ACCORDS SIGNIFICANT

## DEFERENCE TO A DEBTOR'S DECISION TO

## REJECT OR ASSUME PRE-PETITION CONTRACTS

15 | Section 365 of the Bankruptcy Code authorizes a trustee and, therefore, a debtor-in-

16 | possession, subject to court approval, to reject any executory contract or unexpired lease of the

17 | debtor. Bankruptcy Code Section 365 provides in pertinent part:

> (a) ... the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

19 | 11 U.S.C. § 365(a).

20 | "Rejection of an executory contract ... relieves the debtor of burdensome future

21 | obligations while [it] is trying to recover financially..." In re Onecast Media, Inc., 439 F.3d 558,

22 | 563 (9th Cir. 2006). "Thus, 'rejection' is the decision of the trustee or the debtor, as the case may

23 | be, not to assume a burdensome contract or lease." In re Bergt, 241 B.R. 17, 33 (Bankr.D.Alaska

24 | 1999). "Rejection of an executory contract relieves the debtor of the duty to perform its

25 | obligations under the contract, and is 'vital to the basic purpose [of] a Chapter 11 reorganization.'"

26 | In re Penn Traffic Co., 2005 WL 2276879, *4 (S.D.N.Y. 2005) quoting NLRB v. Bildisco &

27 | Bildisco, 465 U.S. 513, 528 (1984).

28 |

In examining whether rejection is appropriate in a given case, courts typically inquire whether or not the proposed rejection is within the sound "business judgment" of the trustee or debtor in possession.  In re Orion Pictures Corp., 4 F.3d 1095, 1099 (2nd Cir. 1993), cert. denied, 114 S.Ct. 1418 (1994); In re Lubrizol Enterprises, 756 F.2d 1043 (4th Cir. 1985) cert. denied, 475 U.S. 1057 (1986); In re Huang, 23 B.R. 798, 800 (9th Cir. BAP 1982); In re Minges, 602 F.2d 38, 43 (3d Cir. 1979).

Under the business judgment test, the Court should give "great deference" to the Debtor's business decision to assume or reject.  See In re A.H. Robins Co., 68 B.R. 705, 710 (Bankr.E.D.Va. 1986) ("court will give **great deference** to the business judgment of the debtor-in-possession regarding its decision to assume or reject").[1]

Since the Debtor will no longer be operating any business, except for the contracts that are being assumed and assigned to Purchaser, all other contracts relating to the Debtor's business, some or all of which may be executory, have no value to the Debtor's estate.  Accordingly, the Debtor has determined in the exercise of its reasonable business judgment that the Debtor's interests, if any, in any agreement not assumed and assigned to Purchaser should be rejected.

## VIII.

## THE COURT HAS THE DISCRETION TO AND SHOULD WAIVE
## THE TEN-DAY PERIOD FOR THE EFFECTIVENESS OF A SALE ORDER.

Rule 6004(g) of the Federal Rules of Bankruptcy Procedure provides: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, *unless the court orders otherwise*." Fed.R.Bankr.P. 6004(g)(emphasis added).  The legislative history provides:

> "The court may, in its discretion, order that Rule 6004(g) is not applicable so that the property may be used, sold, or leased immediately in accordance with the order entered by the court.  Alternatively, the court may order that the stay under Rule 6004(g) is for a fixed period less than 10 days."

The Debtor believes that, unless there are objections to the Motion that are not consensually resolved, the protections afforded by Rule 6004(g) would be inapplicable to the sale of the Assets.

---

[1] See also, In re JFD Enterprises, 215 F.3d 1312, 2000 WL 560189, *5 (1st Cir. 2000); In re Thinking Machine Corp., 67 F.3d 1021, 1028 (1st Cir. 1995).

1 Further, as set forth more fully above, the circumstances of this case militate in favor of allowing

2 the transaction contemplated by the Agreement as soon as possible. Accordingly, the Debtor

3 request that the Court order that the sale may be effectuated immediately upon entry of the order.

**IX.**

**CONCLUSION**

For the foregoing reasons, the Debtor respectfully requests that the Court grant the relief

prayed for herein.

DATED: May 15, 2009           **WINTHROP COUCHOT**
                               **PROFESSIONAL CORPORATION**

                               By:   /s/ Marc J. Winthrop
                                      Marc J. Winthrop
                                      Charles Liu
                                      Payam Khodadadi
                               General Insolvency Counsel for
                               Debtor and Debtor-in-Possession

## DECLARATION OF DENNIS SHOGREN

I, Dennis Shogren, hereby declare and state as follows:

1.      I am the Chief Executive Officer of Modtech, Holdings, Inc., a Delaware corporation, the debtor and debtor-in-possession herein (the "Debtor"). The facts stated herein are within my personal knowledge, whether acquired directly, or through my familiarity with the Debtor's books and records in my capacity as an officer. The opinions expressed herein represent the opinions of the Debtor entity, of which I am an authorized agent, unless otherwise indicated.

2.      The Debtor was founded in 1982 with its initial business consisting of purchasing unfinished and outdated classroom shells and performing installation work. The Debtor subsequently changed its business to the design, manufacturing, marketing and installation of classroom and other custom modular projects. In February 1999, the Debtor merged with SPI Holdings Inc., a Colorado corporation, which designed and manufactured commercial and light industrial modular buildings in Arizona, Texas and California. In March 1999, the Debtor acquired Coastal Modular Buildings, Inc., and in March 2001 the Debtor acquired Innovative Modular Structures. Both companies were based in central Florida. All of the acquired companies were fully integrated into the Debtor.

3.      The Debtor was a leading provider of modular classrooms in California and Florida and was a significant provider of commercial and light industrial modular buildings in California, Florida, Arizona, Nevada and other neighboring states. The Debtor also produced other modular building products such as single family and multi-unit residences, military training buildings, and concrete block restroom facilities.

4.      In California, the Debtor markets and sells modular classrooms primarily to school districts. Sales of classrooms to individual California school districts accounted for approximately 49.9% of net sales during the year ended December 31, 2007. The Debtor also designs and builds modular buildings to customer specifications for a wide array of uses beyond California classrooms, including residential, governmental, healthcare, educational, airport and correctional facilities; office and retail space; daycare centers; libraries; churches; construction trailers; golf clubhouses; police stations; convenience stores; fast food restaurants; classrooms and

MAINDOCS-#129953-v3-Modtech_-_Sale_Motion.DOC

sales offices. The Debtor also sells classrooms to the State of California and leasing companies, both of which lease the classrooms principally to school districts. The Debtor markets modular classrooms directly and its other products are sold through a network of independent dealers.

5.     A substantial portion of the Debtor's sales require bid, performance and payment bonds to ensure that the contracts will be performed and completed in accordance with contract terms and conditions, and to assure that subcontractors and suppliers will be paid. From time to time the Debtor has had difficulty in obtaining bonding for certain large projects.

6.     The Debtor's financial problems and the consequent need to file this bankruptcy proceeding was primarily caused by the following problems:

The decrease in sales in 2008 in California was primarily due to a continuing general slowdown in the education and commercial markets and general economic conditions. California public school enrollment has been essentially flat over the last three years and, while funds from recently enacted bond measures are available, spending for new schools has slowed from prior years. This leveling off of school enrollment has led to decreased demand for new school construction, causing a higher percentage of school bond funds to be utilized for modernization of existing structures and less on new permanent construction or facilities. Even the fast growing school districts are proceeding more conservatively in light of the slowdown in other districts. The modernization work did not benefit the Debtor due to the availability of temporary classrooms from existing stock of leasing companies. It appears that the State of California's current budget deficit and current proposed budget cuts have caused delays in school construction projects, in spite of voter-approved bond measures for classroom and school construction. The decrease in the commercial market can be attributed to the slowdown in the construction and housing markets.

The sales decrease in Florida in 2008 was due to slowness in the education market as a result of declining school enrollment. The sales decrease in Arizona in 2008 was due to the decreased volume of orders in the education markets for Arizona and Nevada.

7.     The Debtor has spent a significant amount of time marketing its property and business as a going concern both prior to filing for Chapter 11 protection and following the filing

1   for Chapter 11 protection. The Debtor has been unsuccessful in its attempts to find a suitable

2   purchaser.

3       8.      Prior to filing for Chapter 11 protection, the Debtor held meetings with, among

4   others, Cavco Industries, Inc. ("Cavco"), one of the largest producers of manufactured homes in

5   the United States and Palm Harbor Homes, Inc. ("Palm Harbor"), one of the largest marketers of

6   factory built homes in the United States. Both Cavco and Palm Harbor expressed interest in doing

7   business with, or taking over, the Debtor. To that end, the Debtor pursued negotiations with

8   Cavco and Palm Harbor based on its determination that such companies could offer the Debtor

9   with the best return for its business. In both circumstances, the Debtor explored the possibility of

10  a joint venture and the out right sale of its business as a going concern. However, due to the

11  economic downturn in 2008, neither the negotiations with Cavco nor Palm Harbor came to

12  fruition.

13      9.      Following the filing for Chapter 11 protection, the Debtor met with various

14  companies, including Sustainable Structures, Silver Creek Industries, Inc. ("Silver Creek"),

15  Southern Modular Industries LP ("Southern Modular") and Global Modular Inc. ("Global

16  Modular"). The Debtor, however, was unsuccessful to come to an agreement with any of these

17  companies. With respect to Sustainable Structures, the offer made was too low. Silvercreek and

18  Southern Modular, both of which had held meetings with Laurus (defined below), the Debtor's

19  pre-petition and post-petition creditor, were only interested in purchasing some of the Debtor's

20  assets, and were not interested in buying the Debtor as a going concern. The Debtor decided not

21  to go forward with the offered sale with such entities based on its determination that such a sale

22  would not provide the Debtor with the highest and best value for its business. Finally, Global

23  Modular, which has purchased a majority of the Debtor's tangible equipment and inventory in

24  California and Florida, has shown interest in a licensing agreement to use a portion of the

25  Debtor's facilities on a project-by-project basis but is not interested in purchasing the Debtor as a

26  going concern or purchasing all of the Debtor's assets.

27      10.     The Debtor did not hire a broker to market its assets. This is because the Debtor

28  believed the most likely buyer of the Debtor's assets would be another "player" in the industry

MAINDOCS-#129953-v3-Modtech_-_Sale_Motion.DOC

1   and the Debtor's management had relationships with the industry "players." Therefore, the

2   Debtor was able to directly approach seven other companies in the industry and entered into

3   discussions with six of them without the need to pay any broker. Furthermore, there were three

4   investment bankers on the Debtor's board of directors who put out "feelers" for potential

5   investors.

6       11.    The Purchaser is the Debtor's principal pre-petition secured creditor who holds a

7   security interest in substantially all of the Debtor's assets. As of the Petition Date, the

8   approximate sum of $14,402,008 was due to the Purchaser. Following the Sale, the Debtor's

9   CEO, Dennis Shogren, may work for the Purchaser in a significant management capacity, but

10  there is no agreement or proposed agreement in this regard.

11      12.    In May, 2009, after negotiations between the parties, the Debtor entered into an

12  Asset Purchase Agreement (the "Agreement") with Laurus Master Fund, Ltd., a Cayman Islands

13  company (In Liquidation) ("LMF"), Valens Offshore SPV I, Ltd., a Cayman Islands company

14  ("VOFSPVI") and Valens U.S. SPV I, LLC, a Delaware limited liability company ("Valens US"

15  and together with LMF, VOFSPVI, Valens US, and with their respective successors, assigns, and

16  designees, collectively, the "Purchaser" or "Laurus") , subject to higher and better offers, except

17  as otherwise noted herein. A copy of the Agreement, without schedules and exhibits except for

18  Schedule 3.1 setting forth the Purchaser's claim (which schedules and exhibits are available from

19  Debtor upon request), is attached hereto as Exhibit "1". Capitalized terms not otherwise defined

20  herein shall have the meanings set forth in the Agreement.

21      13.    The Purchaser is the Debtor's principal pre-petition secured creditor who holds a

22  security interest in substantially all of the Debtor's assets. As of the Petition Date, the

23  approximate sum of $14,402,008 was due to the Purchaser. Following the Sale, I may work for

24  the Purchaser in a significant management capacity, but there is no agreement or proposed

25  agreement in this regard.

26      14.    The proposed Bid Procedures are attached hereto as Exhibit "2".

27      15.    The Debtor believes that the proposed sale will yield substantially more than a

28  liquidation sale. If the Debtor cannot consummate the Sale, the Debtor is unlikely to have the

resources to sustain its operations and could therefore be forced to sell the Assets at liquidation value. Consequently, the proposed sale will maximize value for the estate's creditors.

16. The modular construction industry is a small industry and the Debtor is familiar with most of the players in this industry. Since its decision to pursue the Sale, the Debtor's personnel have worked actively in identifying and contacting potential buyers from the Debtor's contacts in the industry. The Agreement provides the best offer received by the Debtor for the Assets. All of the parties who have previously expressed interest in the Assets and other industry players the Debtor believes would be interested in bidding will receive notice of the Sale motion. The Debtor will continue to market the Assets to any and all potential buyers that express an interest in purchasing the Assets.

17. The Debtor's management believes that a sale of the Assets, as contemplated by Bidder's offer, represents a value that is consistent with the fair market value of these assets on a going concern basis. Also, although Lenders do not have a perfected lien in the real property lease in which the Debtor conducts its business, the Debtor believes the lease is a market lease, and thus there is no equity in such lease.

18. The Debtor believes that the proposed sale to Lenders is fair and reasonable, and represents the highest price obtained for the Assets.

19. I am informed that the secured creditors consent to the proposed sale.

20. The Purchased Assets are being marketed to all parties that the Debtor believes could be interested in buying the Purchased Assets. The proposed offer by the Purchaser is the only offer received. There is no evidence of "self-dealing" or manipulation with respect to the sale of the Purchased Assets, as the sale is being noticed to all creditors and realistic potential acquirors of the Purchased Assets. Rather, the purchase offer was negotiated, with the assistance of counsel, with a purchaser that is also represented by counsel, in an arms-length transaction, and therefore constitutes a good faith purchase in accordance with 11 U.S.C. §363(m).

21. The Debtor proposes to assume and assign to Purchaser or the Successful Bidder the contracts set forth on Schedule 2.1 to the Agreement. The Agreement requires the Purchaser

22.     Adequate assurance of future performance by the Purchaser under the contracts to be assumed and assigned is provided by the financial strength and experience of the Purchaser. In this case, I am informed the Purchaser has tremendous resources and is well capitalized and structured.

23.     Since the Debtor will no longer be operating any business, except for the contracts that are being assumed and assigned to Purchaser, all other contracts relating to the Debtor's business, some or all of which may be executory, have no value to the Debtor's estate. Accordingly, the Debtor has determined in the exercise of its reasonable business judgment that the Debtor's interests, if any, in any agreement not assumed and assigned to Purchaser should be rejected.

I declare that the foregoing is true and correct under the penalty of perjury.

Executed this 5th day of May 2009, in Perris, California.

_Dennis L. Shogren_
Dennis Shogren